1

2

3

4

5

6

7                             UNITED STATES DISTRICT COURT

8                                 DISTRICT OF NEVADA

9                                        * * *

10   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
11                                  )
                  Plaintiff,        )              2:10-CV-2166-PMP-CWH
12                                  )
     v.                             )
13                                  )
     MARCUS A. LUNA; NATHAN         )              ORDER
14   MONTGOMERY; ADAM DASKIVICH;    )
     DAVID MURTHA; ST. PAUL VENTURE )
15   FUND, LLC; MINNESOTA VENTURE   )
     CAPITAL, INC.; REAL ESTATE OF  )
16   MINNESOTA, INC.; and MATRIX    )
     VENTURE CAPITAL, INC.,         )
17                                  )
                  Defendants.       )
18   ────────────────────────────── )

19          Presently before the Court is Defendants Nathan Montgomery and Minnesota

20   Venture Capital, Inc.'s Motion for Summary Judgment (Doc. #74), filed on January 31,

21   2013.  Plaintiff Securities and Exchange Commission filed an Opposition (Doc. #86) on

22   March 15, 2013.  Defendants Nathan Montgomery and Minnesota Venture Capital, Inc.

23   filed a Reply (Doc. #88) on March 29, 2013.

24          Also before the Court is Plaintiff Securities and Exchange Commission's Motion

25   for Summary Judgment (Doc. #75), filed on January 31, 2013.  Defendants Nathan

26   Montgomery and Minnesota Venture Capital, Inc. filed an Opposition (Doc. #79) on March

15, 2013.  Defendants Marcus Luna and St. Paul Venture Fund, LLC filed an Opposition (Doc. #80) on March 15, 2013.  Defendants Adam Daskivich, Real Estate of Minnesota, Inc., David Murtha, and Matrix Venture Capital, Inc. filed an Opposition (Doc. #82) on March 15, 2013.  Plaintiff Securities and Exchange Commission filed a Reply (Doc. #89) on March 29, 2013.

The Court previously denied these motions, without prejudice to renew, while the parties pursued settlement efforts.  (Min. Order (Doc. #98).)  On November 18, 2013, the parties advised the Court that settlement efforts had failed, and the summary judgment motions were reinstated.  (Joint Mot. to Reinstate Summ. J. Mots. (Doc. #106), Order (Doc. #107).)

## I.  BACKGROUND

This is a civil enforcement action brought by the Securities and Exchange Commission ("SEC") against four individuals, Defendants Marcus Luna, Nathan Montgomery, Adam Daskivich, and David Murtha, and their respective entities, Defendants St. Paul Venture Fund, LLC; Minnesota Venture Capital, Inc.; Real Estate Minnesota, Inc.; and Matrix Venture Capital, Inc.  The SEC alleges all Defendants violated the registration provisions of the Securities Act, which prohibit selling or offering to sell unregistered securities unless an exemption from the registration requirement applies.  The SEC also alleges Defendant Marcus Luna violated the anti-fraud provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

On October 19, 2005, Defendant Marcus Luna ("Luna") organized Defendant St. Paul Venture Fund, LLC ("St. Paul") in Minnesota.  (Appx. to Pl.'s Mot. Summ. J. (Doc. #76) ["Pl.'s MSJ"], Ex. 17 at 2, Ex. 36.)  Within days thereafter, Defendant Nathan Montgomery ("Montgomery") organized Minnesota Venture Capital, Inc. ("MVC"); Defendant Adam Daskivich ("Daskivich") organized Defendant Real Estate Minnesota, Inc. ("REM"); and Defendant David Murtha ("Murtha") organized Defendant Matrix Venture

Capital, Inc. ("Matrix"), all in Minnesota.  (Pl.'s MSJ, Ex. 16 at 4, Ex. 17 at 2, Ex. 18 at 5, Ex. 19 at 5, Ex. 24, Ex. 32, Ex. 51.)  Each individual Defendant is the sole owner and only officer or director of his respective company.  (Pl.'s MSJ, Ex. 16 at 4, Ex. 17 at 2, Ex. 18 at 5, Ex. 19 at 5.)

Non-party Axis Technologies, Inc. ("Axis") was a fluorescent lighting company.  (Pl.'s MSJ, Ex. 7 at 11-12.)  Axis originally was a private, closely-held corporation owned by its four founders.  (Id. at 18-20.)  In the 2005 to 2006 time frame, Axis sought to raise capital.  (Id. at 21.)  One of the options Axis considered was becoming a publicly traded company.  (Id.)  One of Axis's founders, James Erickson, Jr. ("Erickson"), was introduced to Defendant Luna as someone who could assist Axis in going public.  (Id. at 23.)  Luna proposed a reverse merger through which a public shell company would acquire Axis, along with a private placement of stock with a group of investors who would invest $300,000 in exchange for a twenty-five percent share of the newly formed company.  (Id. at 30-31, 35-37, 69.)

On September 21, 2006, Luna, acting on behalf of a company called Taurus Capital Corporation, sent Axis a term sheet for equity financing.  (Pl.'s MSJ, Ex. 39.)  The term sheet proposed a reverse merger whereby Riverside Entertainment, Inc. ("Riverside"), a company that is traded on the National Quotation Bureau Pinksheets, would acquire Axis.  (Pl.'s MSJ, Ex. 7 at 30-31, 35-36, Ex. 39.)  Axis's founders would receive shares of the newly formed company's stock in exchange for their shares of Axis.  (Pl.'s MSJ, Ex. 1 at 28, Ex. 7 at 30-31, Ex. 38, Ex. 39.)  Additionally, a twenty-five percent share of stock would be offered in a private placement to a group of investors in exchange for $300,000 to be invested in the newly formed company, Axis Technologies Group, Inc. ("Axis Technologies Group").  (Pl.'s MSJ, Ex. 7 at 11-12, 37, Ex. 38, Ex. 39.)  The term sheet proposed that the private placement be offered to "accredited investors."  (Pl.'s MSJ, Ex. 39.)  As relevant to this case, an accredited investor includes (1) a company with assets over

$5,000,000 which was not formed for the specific purpose of acquiring the securities offered; (2) a person whose individual net worth exceeds $1,000,000; (3) a person who earned income over $200,000 in each of the two most recent years and has a reasonable expectation of earning over $200,000 in the current year; or (4) an entity whose equity owners are accredited investors.  17 C.F.R. §§ 230.501(a)(3), (5), (6), (8).

On September 26, 2006, Taurus Capital Corporation, through Luna, wired $299,000 to Axis Technologies Group.[1]  (Pl.'s MSJ, Ex. 1 at 169, Ex. 7 at 81-82.)  On September 29, 2006, Axis Technologies Group issued a board resolution directing that 15,000,000 shares of its stock be issued as follows: 3,500,000 each to REM and Matrix, and 4,000,000 each to MVC and St. Paul.  (Def. Nathan Montgomery's Mot. Summ. J. (Doc. #74) ["Montgomery MSJ"], Ex. 4.)  The board resolution indicated that Axis Technologies Group had "obtained investment commitments from Accredited Investors" during the Minneapolis Accredited Investors Conference which allegedly[2] took place in Bloomington, Minnesota on July 25, 2006, at which the proposed $300,000 investment in Axis was offered.  (Montgomery MSJ, Ex. 4, Ex. 21; Pl.'s MSJ, Ex. 11 at SEC_HLLDY_000264-71.)  REM and Matrix each signed subscription agreements dated July 25, 2006, agreeing to purchase 3,500,000 Axis shares.  (Defs. Marcus Luna & St. Paul Venture Fund Opp'n to Pl.'s Mot. Summ. J. (Doc. #80) ["Luna Opp'n"], Ex. A; Pl.'s MSJ, Ex. 11 at SEC_HLLDY_000264-71.)  That same date, St. Paul and MVC also signed subscription agreements for 4,000,000 shares each.  (Luna Opp'n, Ex. A; Pl.'s MSJ, Ex. 11 at SEC_HLLDY_000264-71.)  According to the Axis Technologies Group board resolution,

---

[1]  Luna withheld $1,000 to cover wire fees and fees related to issuing new certificates.  (Pl.'s MSJ, Ex. 42.)

[2]  When asked at his deposition about whether this conference actually took place, Defendant Montgomery asserted his rights under the Fifth Amendment to the United States Constitution.  (Pl.'s MSJ, Ex. 8 at 166-67.)

"in accordance with and based upon the company's 1933 Securities Act, Regulation D, Rule 504[3] private placement offering to accredited investors within the state of Minnesota pursuant to an exemption from registration under Minnesota Statute § 80A.15(g), issues of the shares shall be issued 'free trading' shares represented by certificates issued without restriction thereon."  (Id. at 2.)

On October 24, 2006, Luna, who is an attorney, sent an opinion letter to Axis Technologies Group's transfer agent, Holladay Stock Transfer, Inc. ("Holladay").[4] (Montgomery MSJ, Ex. 19; Pl.'s MSJ, Ex. 7 at 24, Ex. 11 at 4.)  In the opinion letter, Luna represented himself as Axis Technologies Group's attorney, and stated he was asked to render an opinion "regarding the free trading status of certain shares to be issued by [Axis Technologies Group] pursuant to a private placement offering and to request the issuance" of the 15,000,000 shares to the four company Defendants.  (Montgomery MSJ, Ex. 19 at 1.) Luna stated he was basing his opinion, in part, on the fact that the purchasers of the 15,000,000 shares "qualify as 'Accredited Investors' organized and domiciled within the State of Minnesota," and based on the fact that the offer and purchase of the shares were "undertaken and consummated within the State of Minnesota, pursuant to a private placement offering conducted pursuant to Rule 504 of the Securities Act and § 80A.15(g) of the Minnesota Statutes."  (Id. at 2.)

///

Luna opined that securities that are exempt from registration under Rule 504

---

[3]  See 17 C.F.R. § 230.504(b)(1)(iii).  "Rule 504 is the limited offering exemption designed to aid small businesses raising 'seed capital.'"  Revision of Rule 504 of Regulation D, the "Seed Capital" Exemption, Securities and Exchange Commission Release No. 7644, 1999 WL 95490, at *1 (Feb. 25, 1999).

[4]  Holladay is a transfer agent registered with the SEC.  (Pl.'s MSJ, Ex. 11 at 1.)  As transfer agent, Holladay was responsible for, among other things, "issuing and canceling share certificates to reflect changes in Axis stock ownership, and keeping records of who owned Axis stock, how many shares each shareholder owned and how those shares were held."  (Id.)

must be restricted "unless specific conditions permitting a public offering are met."  (Id.)

One of these conditions is that "the securities are issued under a state law exemption that

permits general solicitation and general advertising so long as sales are made only to

'accredited investors' as that term is defined in Regulation D."  (Id. at 2-3.)  Luna further

opined that "Section 80A.15 of the Minnesota Statutes provides that certain transactions

involving the offer and sale of securities are exempt from the registration requirements of

Minnesota state law.  It is this exemptive provision which provides the basis for issuance of

free trading shares under the related Federal Rule 504 exemption."  (Id. at 3.)

Luna explained as follows:

> A.  Specifically, subparagraph (g) of § 80A.15 exempts transactions involving offers or sales to any bank, saving institution, trust company, insurance company, investment company or other financial institution or institutional buyer.
> B.  Minnesota Regulation 2875.0170 specifically defines "Institutional Buyer" as an "Accredited Investor" within the meaning of Rule 501(a) of Regulation D of the Securities Act.  Further, the other specified categories of exempt purchasers under the Minnesota Statutes and Regulations are paralleled by the definition of what constitutes an "Accredited Investor" under Federal Law.  Thus, offers and sales to "Institutional Buyers" i.e., "Accredited Investors" (as defined under the parallel Federal Rule) are transactions exempted from registration by Minnesota statute.
> C.  Minnesota Regulations 2875.0510, 2875.0520 and 2875.0540 set forth the state rules regarding advertising, which is defined under state law as any "written or printed communication or any communications by means of recorded telephone messages or transmitted on radio, television, or similar communications media, including film strips and motion pictures, published in connection with the offer or sale of a security."  Minn. Reg. 2875.0510.  Under state law, advertising or sales literature used in connection with any exempt transaction (e.g., Minnesota Statutes § 80A.15(g)) is permitted without the necessity of filing with the state.  Thus, the state law permits general solicitation (i.e., "Advertising" as defined in Minn. Reg. 2875.0510) without prior approval or filing, so long as sales are made only to Accredited Investors, pursuant to the exemption found in subparagraph (g) of § 80A.015 of the Minnesota Statutes.

(Id.)  Based on this analysis, Luna concluded:

> If the securities are issued under a state law exemption that permits general solicitation and general advertising (so long as sales are made only to 'accredited investors'), the securities are NOT restricted under

6

Rule 504 and are properly issued without a restrictive legend.  In this case, based upon the representations made to me and my review of pertinent documents, it appears that the Shares are being purchased by Minnesota domiciled entities, within the State of Minnesota, all of which are "Accredited Investors" as defined under State and Federal laws.  Because the Shares are being sold to the Shareholders pursuant to the Minnesota Statutes which specifically exempts sales to such accredited investors and because the Minnesota Regulations allow for general solicitation and advertising relating to such offers and sales, the Shares may be issued without a restriction and may be freely traded pursuant to Rule 504.

(Id. at 3-4.)  Luna therefore directed Holladay to issue the Defendant companies their respective shares without a restrictive legend.[5]  (Id. at 5.)

Holladay relied on Luna's opinion letter "in determining that it was appropriate to issue 15,000,000 shares of Axis stock as 'free trading' shares without a restrictive legend." (Pl.'s MSJ, Ex. 11 at 5.)  On October 26, 2006, Axis Technologies Group transferred the 15,000,000 shares as indicated.  (Pl.'s MSJ, Ex. 11 at SEC_HLLDY_000251.)  Axis's founders, meanwhile, received restricted shares which they could not sell for one year.  (Pl.'s MSJ, Ex. 1 at 28.)

On November 2, 2006, REM, Matrix, MVC, and St. Paul each issued board resolutions authorizing their Axis Technologies Group shares to be broken into certificates for smaller amounts of shares, and authorizing some of their Axis Technologies Group shares to be transferred to other companies.  (Pl.'s MSJ, Ex. 11 at SEC_HLLDY_000016-17, 19-20, 22-23, 25.)  On November 3, 2006, REM, Matrix, MVC, and St. Paul directed Holladay to re-issue the shares as indicated in their respective November 2 board resolutions.  (Pl.'s MSJ, Ex. 11 at SEC_HLLDY_000013-25.)

---

[5]  A restrictive legend is placed on a security to advise potential buyers that the security has not been registered and may be offered and sold only if the security is registered or if its sale qualifies for an exemption from the registration requirement.  See Use of Legends and Stop--Transfer Instructions as Evidence of Nonpublic Offering, SEC Release No. 33-5121, 1971 WL 120470 (Feb. 1, 1971).

On November 9, 2006, REM, Matrix, MVC, and St. Paul each transferred Axis Technologies Group shares to a brokerage, Legent Clearing LLC ("Legent"). (Pl.'s MSJ, Ex. 11 at SEC_HLLDY_000031, 37, 51; Pl.'s MSJ, Ex. 14 at 2-3.) Additionally, on that same date, several of the companies to whom the Defendant companies had transferred shares also transferred their shares to Legent. (Pl.'s MSJ, Ex. 11 at SEC_HLLDY_000051.) Starting on November 13, 2006, the Defendant companies started selling their Axis Technologies Group shares from their Legent accounts. (Pl.'s MSJ, Ex. 14 at 3.) Erickson, one of Axis's founders, could not identify any development at Axis Technologies Group that would have instigated shareholders to begin selling their stock on November 13, 2006. (Pl.'s MSJ, Ex. 7 at 85.) On November 14, 2006, an advertisement entitled "New Stocks to Watch on Wall Street" touted Axis Technologies Group's business prospects, identified the stock symbol, listed the current price as seventy-eight cents per share, and identified the "Beacon Equity Research Target Price" as $3.06 per share. (Pl.'s MSJ, Ex. 41.) However, according to Erickson, Axis Technologies Group did not issue any press releases or promotional materials for Axis Technologies Group stock. (Pl.'s MSJ, Ex. 7 at 101-02.)

Both the volume and price of shares in Axis Technologies Group showed significant increases starting on November 13, 2006. Prior to that date, trade volumes were significantly lower than the 4,000,000 shares traded on November 13, 2006. (Pl.'s MSJ, Ex. 14 at 2.) From November 13, 2006 to February 16, 2007, the average daily trading volume was 845,000 shares. (Id.) The average closing price for Axis Technologies Group stock from October 20, 2006 to November 10, 2006 was ninety-three cents per share. (Id.) The price peaked on November 27, 2006 at $3.47 per share. (Id.)

St. Paul sold its shares from November 13, 2006 to December 7, 2007, receiving proceeds of $2,030,540. (Id. at 4.) MVC sold its shares from November 13, 2006 to December 5, 2007, receiving proceeds of $1,970,956. (Id.) REM sold its shares from November 13, 2006 to December 14, 2007, receiving proceeds of $2,735,924. (Id.) Matrix

sold its shares from November 13, 2006 to February 15, 2007, receiving proceeds of $1,378,785.  (Id.)  REM transferred $1.75 million of the proceeds from its Axis Technologies Group stock sales to Luna.  (Id. at 5-6.)  Matrix transferred $122,000 of the proceeds from its Axis Technologies Group stock sales to Luna.  (Id. at 6.)  In total, Defendants received $8.1 million in proceeds from the sale of Axis Technologies Group stock.  (Id. at 3.)  Throughout the period that Defendants traded Axis Technologies Group stock, the stock was not registered with the SEC.  (Pl.'s MSJ, Ex. 15.)

The SEC commenced this civil action against Defendants on December 14, 2010. (Compl. (Doc. #1).)  In count one of the Complaint, the SEC alleges all Defendants violated Sections 5(a) and (c) of the Securities Act by offering and selling unregistered securities to public investors.  (Id. at 13.)  Counts two through four allege Defendant Luna violated various sections of the Securities Act, the Exchange Act, and Rule 10b-5 by making false statements of material fact in the offer and sale of securities.  (Id. at 14-15.)  Specifically, the Complaint alleges Defendant Luna "misrepresented the facts and nature of the transactions" to Holladay, falsely represented that the offers and sales to accredited investors were exempt, and falsely represented the four company Defendants were accredited investors when he knew they were not.  (Id. at 3, 7, 8-10.)  The Complaint alleges Luna "created the Defendant Entities to act as conduits to allow him and his cohorts, Defendants Montgomery, Daskivich, and Murtha, to sell their stock into the public market at artificially supported prices."  (Id. at 3.)  The SEC seeks injunctive relief, disgorgement, and civil penalties against Defendants.  (Id. at 15-17.)

Defendants Montgomery and MVC now move for summary judgment, arguing that the shares properly were issued to MVC as free trading shares because Luna's opinion letter was correct that federal and Minnesota laws and regulations allowed for an exemption from registration so long as the sales were made to accredited investors.  Montgomery and MVC contend no genuine issue of material fact remains that MVC qualified as an

accredited investor because Montgomery, as MVC's sole owner, had a net worth of over $1 million.

The SEC opposes Montgomery and MVC's Motion, arguing that Montgomery and MVC do not dispute the SEC has established its prima facie case that they violated the registration requirement. The SEC contends Montgomery and MVC bear the burden of establishing an exemption to the registration requirement, and they has failed to do so because Montgomery and MVC were statutory underwriters of Axis Technology Group's public offering, and are thereby not entitled to an exemption. Additionally, the SEC argues that neither Rule 504 nor Minnesota law provide an applicable exemption. Finally, the SEC contends that even if such an exemption existed, neither MVC nor Montgomery qualify as accredited investors.

The SEC also moves for summary judgment on all its claims. The SEC contends it has established its prima facie case that Defendants violated the registration requirements because no registration statement was in effect when Defendants sold Axis Technologies Group stock. The SEC also anticipates that Defendants will assert the affirmative defense that the sales were exempt from the registration requirement, but the SEC contends no exemption applies. The SEC argues the offering of Axis Technologies Group stock constituted an unregistered public offering for which Defendants were statutory underwriters who are ineligible for an exemption. The SEC also argues that Luna's opinion that Rule 504 and Minnesota law provide for an exemption is incorrect, and, in any event, the company Defendants were not accredited investors. Finally, the SEC argues Luna made false representations to Holladay in his opinion letter regarding the nature of the transactions at issue, despite his knowledge that Defendants were engaged in an unregistered public offering. In support of each of its claims, the SEC argues the Court should draw adverse inferences against Defendants because Defendants Luna, Montgomery, Daskivich, and Murtha invoked their rights under the Fifth Amendment to the

United States Constitution and declined to answer nearly every question put to them at their respective depositions.

Defendants Montgomery and MVC respond that the SEC's argument regarding Defendants being statutory underwriters is a newly proposed theory that was not pled in the Complaint, and the Court therefore should not consider it.  Montgomery and MVC also contend the Court should not draw an adverse inference against them.  Specifically, they argue the SEC cannot establish it had a substantial need for Montgomery's testimony where the SEC could resort to documentary evidence, Montgomery answered questions about his assets, and drawing an inference against him based on questions unrelated to his status as an accredited investor would be prejudicial.  Montgomery and MVC also seek to strike the testimony of the SEC's expert as improper legal conclusions.

Defendants Luna and St. Paul respond to the SEC's Motion by arguing that, as set forth in Luna's opinion letter, the sale of the Axis Technologies Group shares to Defendants was exempt under Rule 504 and Minnesota law.  Luna and St. Paul further contend that the company Defendants were accredited investors.  As to the fraud claims against Luna, Luna argues the SEC has failed to establish its prima facie case because even if Luna were incorrect in his opinion letter, and even if the company Defendants were not actually accredited investors, Luna's interpretation of the law was reasonable and it was reasonable for Luna to believe the company Defendants were accredited investors.  Luna contends he therefore lacked scienter to support the fraud claims.  Luna contends that an adverse inference against him on the issue of scienter would be inappropriate because the SEC presented no independent evidence of scienter.  Finally, Luna joins the argument regarding SEC's expert.

Defendants Daskivich, REM, Murtha, and Matrix respond to the SEC's Motion by arguing the SEC's theory about Defendants being statutory underwriters is a newly-asserted theory that the Court should not consider because it was raised for the first time at

summary judgment.  These Defendants also argue the exemption as set forth in Luna's opinion letter applied, and genuine issues of fact remain as to whether REM and Matrix were accredited investors.  These Defendants contend the Court should not draw an adverse inference against them because the SEC's new theory was not presented to Daskivich or Murtha prior to their depositions, and thus they did not have an opportunity to determine whether to invoke their Fifth Amendment rights in relation to this new theory.  Finally, these Defendants join the argument regarding SEC's expert.

## II. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  If the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

### A.  The SEC's Section 5 Prima Facie Case

"Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a), (c), make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed as to that security, unless the transaction qualifies for an exemption from registration."  S.E.C. v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1085 (9th Cir. 2010).  Registration protects "investors by promoting full disclosure of information thought

necessary to informed investment decisions." <u>S.E.C. v. Ralston Purina Co.</u>, 346 U.S. 119, 124 (1953).  To fulfill that goal, registration statements filed with the SEC make available to the public certain information about the company and the offered security.  15 U.S.C. §§ 77f(a), (d).  Registration statements must disclose, among other things, identifying information about the business, its officers, and its underwriters; information about the purposes for which the security being offered is to supply funds and the amounts which will be devoted to those purposes; and information about the business's financial health.  <u>Id.</u> §§ 77f, 77g, 77aa Sched. A.  "Companies that have registered securities under the Securities Act must also abide a regime of regular reporting of material information established in the Securities Exchange Act of 1934."  <u>Platforms Wireless Int'l</u>, 617 F.3d at 1085 (citing 15 U.S.C. §§ 78l, 78m, 78o(d)).  Consequently, "[w]hen a company fails entirely to register its securities and nonetheless proceeds to sell them generally to the public, . . . the entire system of mandatory public disclosure is evaded to public detriment."  <u>Id.</u> at 1085-86.

To establish a prima facie case of a Section 5 violation, the SEC must show: "(1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce."  <u>S.E.C. v. CMKM Diamonds, Inc.</u>, 729 F.3d 1248, 1255 (9th Cir. 2013).  "[S]cienter is not an element of Section 5 liability."  <u>Id.</u> at 1256.

Viewing the facts in the light most favorable to Defendants, no genuine issue of material fact remains that the SEC has met its burden of establishing its prima facie case that each Defendant violated Section 5.  First, it is undisputed that the Axis Technologies Group shares were not registered with the SEC during the relevant time period.  Second, it is undisputed that the company Defendants sold their Axis Technologies Group shares, and that each individual Defendant sold or indirectly sold the shares through his respective wholly owned entity of which he was the sole officer or director.  Finally, it is undisputed that the shares were sold in interstate commerce to the public through Defendants' New

Jersey-based broker, and Defendants received the sale proceeds through wire transfers to their bank accounts.  (Pl.'s MSJ, Ex. 14.)  Throughout the summary judgment briefing, Defendants do not raise any evidentiary issue or legal argument with respect to the SEC's prima facie case.  The SEC therefore is entitled to summary judgment on the issue of whether it has established its prima facie case that each Defendant violated Section 5.

## B.  Defendants' Section 5 Affirmative Defense - Exemptions

Once the SEC establishes its prima facie case that a defendant has violated Section 5's registration provisions, the defendant bears the burden of proving an exemption from the registration provisions applies to each transaction in which the defendant participated.  <u>Platforms Wireless Int'l</u>, 617 F.3d at 1086; <u>S.E.C. v. Phan</u>, 500 F.3d 895, 902 (9th Cir. 2007) ("By its terms, Section 5 of the 1933 Act creates liability for any securities sale for which 'a registration statement is [not] in effect'; it does not limit liability to initial distribution." (emphasis omitted)).  The Court construes exemptions "narrowly . . . to further the purpose of the Act: To provide full and fair disclosure of the character of the securities, and to prevent frauds in the sale thereof." <u>Id.</u> (quotation omitted).  Further, in determining whether Defendants violated Section 5, the Court evaluates form over substance and looks to the economic reality of the transactions at issue.  <u>Platforms Wireless Int'l</u>, 617 F.3d at 1086.

Defendants contend the transactions whereby the company Defendants acquired Axis Technology Group shares were exempt under 15 U.S.C. §77d(a)(2), which exempts "transactions by an issuer not involving any public offering."  Defendants contend the transactions in which the company Defendants sold their Axis Technology Group shares to the investing public were exempt under 15 U.S.C. § 77d(a)(1), which exempts "transactions by any person other than an issuer, underwriter, or dealer."  The SEC responds that Defendants are not entitled to either exemption because the transactions, when viewed as a whole, constituted a public offering and Defendants meet the statutory definition of

underwriters of the public offering.

1.  The Court Will Consider the Underwriter Argument

Defendants argue the SEC cannot pursue the theory that Defendants were underwriters ineligible for an exemption under § 77d(a)(1) because the SEC did not allege facts in the Complaint supporting the theory.  Additionally, Defendants contend the SEC waited until the last day of discovery to supplement its answers to interrogatories to indicate the SEC intended to pursue a theory that Defendants were underwriters.  Defendants argue the SEC never amended its Complaint to add this new theory, and it should not be permitted to do so through summary judgment.

The SEC responds that Federal Rule of Civil Procedure 8 requires only a short and plain statement of the SEC's claim, and the SEC was not required to anticipate in its Complaint any defenses Defendants may raise and any possible response the SEC may have to those defenses.  The SEC argues that exemptions are affirmative defenses, not part of the SEC's prima facie case, and the SEC therefore did not need to allege in the Complaint facts regarding Defendants' underwriter status.  The SEC further contends that the Complaint nevertheless contained factual support for the underwriter argument, as it alleged Defendants engaged in a coordinated scheme for the distribution of Axis Technologies Group stock to the investing public.  As for the SEC's supplemental interrogatory responses, the SEC notes that the parties did not take Montgomery's deposition until after the SEC served its supplemental responses.  Further, the SEC contends Defendants never sought leave to conduct additional discovery on the underwriter issue, and Defendants have not identified any discovery they would have conducted had the SEC supplemented its interrogatory responses earlier.

The Court will consider the SEC's arguments regarding whether Defendants are underwriters who are ineligible for an exemption under § 77d(a)(1).  The SEC need not prove Defendants are underwriters to establish its entitlement to relief on its claim that

Defendants violated Section 5's registration requirement.  Rather, Defendants bear the burden of proving they are not underwriters to succeed on their affirmative defense that their sales of unregistered securities were exempt under § 77d(a)(1).  The SEC is not required to anticipate in its Complaint an affirmative defense, and it need not plead facts in its Complaint supporting its response as to why an affirmative defense fails.  Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012); Fed. R. Civ. P. 8(a), (c).

As to the SEC's failure to supplement interrogatory responses until the last day of discovery, Defendants did not move for leave to reopen discovery, nor have they identified any discovery they would have conducted had the SEC supplemented its responses sooner.  Moreover, the SEC questioned Defendants at their respective depositions on whether they bought the securities with a view toward distribution and questioned Defendants about their coordinated activity in acquiring and selling Axis Technologies Group stock.  (Pl.'s MSJ, Ex. 6 at 79-92, 105, Ex. 8 at 213-18, 224-25, 230, Ex. 9 at 124-25, 131-38, 142, 167-68, Ex. 10 at 62-64, 72-74, 76-81, 86.)  Defendants each invoked the Fifth Amendment in response to these questions.  (Id.)  Defendants thus were presented with this theory at their depositions, and they chose to invoke their Fifth Amendment rights in response.  Defendants have not explained how they are prejudiced by the SEC's decision to supplement its interrogatory responses after the SEC explored Defendants' affirmative defenses during discovery.  The Court therefore will consider the SEC's arguments as to why Defendants' affirmative defense under § 77d(a)(1) does not apply.

### 2.  Public Offering and Underwriter Status

Under § 77d(a)(1), "transactions by any person other than an issuer, underwriter, or dealer," are exempt from the registration requirement, thus exempting "ordinary resales of stock between independent parties."  Phan, 500 F.3d at 902.  This exemption "was intended to exempt only trading transactions between individual investors with relation to

securities already issued, not to exempt distributions by issuers." Platforms Wireless Int'l, 617 F.3d at 1090 (quotation omitted); see also S.E.C. v. Holschuh, 694 F.2d 130, 137-38 (9th Cir. 1982) (stating § 77d(a)(1) "was created to exempt routine trading transactions with respect to securities already issued and not to exempt distributions by issuers or acts of others who engage in steps necessary to such distributions").

The exemption in § 77d(a)(1), by its terms, is not available to transactions by an underwriter.  An underwriter means "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security . . . ." 15 U.S.C. § 77b(a)(11).  The statutory definition of underwriter "depends on the existence of a distribution, which in turn is considered the equivalent of a public offering." Ackerberg v. Johnson, 892 F.2d 1328, 1335 n.6 (8th Cir. 1989).  Thus, determining whether a defendant was an underwriter for purposes of an exemption under § 77d(a)(1) "necessarily entails an inquiry into whether the transaction involves a public offering." Id. The exemption in § 77d(a)(1) therefore bears a statutory relationship to the exemption in § 77d(a)(2), which exempts "transactions by an issuer not involving any public offering."

The exemption in § 77d(a)(1) is not available if the defendant acquired the securities from the issuer with a view to distribution or if the defendant made the sale for an issuer in connection with a distribution.  Id. at 1335-36.  "Relevant to both inquiries are whether the securities have come to rest in the hands of the security holder and whether the sale involves a public offering." Id. at 1336; S.E.C. v. McNamee, 481 F.3d 451, 453 (7th Cir. 2007).

a.  With a View to Distribution

As to whether the securities have come to rest in the hands of the security holder, the inquiry focuses on objective factors, such as how long the defendant held the securities and whether there was an unforeseeable change in the security holder's circumstances. Ackerberg, 892 F.2d at 1336; 17 C.F.R. § 230.144.  Many courts have accepted a "rule of

thumb" that if the security holder held the stock for two years, then the securities "have come to rest," and the security holder therefore did not act with a view to distribute the security. <u>Ackerberg</u>, 892 F.2d at 1336.  Through its regulations, the SEC has created certain safe harbor provisions which, if all other conditions are met, allow for shorter time periods of one year or six months.  17 C.F.R. § 230.144(d).

Here, viewing the facts in the light most favorable to Defendants on the SEC's Motion for Summary Judgment, no genuine issue of fact remains that Defendants acquired the Axis Technologies Group stock with a view to distributing it, not with a view to investing in the company.  The company Defendants acquired their respective shares of Axis Technologies Group stock on October 26, 2006.  Within a week, each of the company Defendants had directed Holladay to break up and re-issue their shares.  Within another week, each of the company Defendants had transferred their shares to a brokerage, and each began selling their shares four days later.  As a result, within nineteen days of receiving their shares, Defendants began selling them.

Although Defendants contend the proper date to consider is when Defendants signed the subscription agreements on July 25, 2006, Axis Technologies Group did not trade under its ticker symbol until October 20, 2006.  (Pl.'s MSJ, Ex. 14 at ¶ 5.)  Defendants thus began selling their shares almost immediately upon being able to do so.  Moreover, even if the Court considered the July 25th date, Defendants held their shares only three and a half months, well below the two year rule of thumb and the shorter time periods in the safe harbor provisions.

Nor does the fact that Defendants continued selling their shares for over a year until December 2007 raise an issue of material fact as to whether Defendants acquired the shares with a view to distribute them.  Shares held a year still fall below the two year rule of thumb, and Defendants present no evidence or argument that they qualified for the shorter safe harbor time periods.  <u>See McNamee</u>, 481 F.3d at 455 ("McNamee formed a plan to

move securities from the issuer to the public, where they would trade freely; that plan is a 'view to a distribution' and the process as a whole an 'offering' no matter how long it takes to accomplish.").

Moreover, the exemption "does not apply to transactions that, though in technical compliance, are designed to evade the registration requirement." Geiger v. S.E.C., 363 F.3d 481, 488 (D.C. Cir. 2004); Platforms Wireless Int'l, 617 F.3d at 1090. When the above evidence is considered in combination with Defendants' coordinated activity, no genuine issue of fact remains that Defendants planned to distribute the stock soon after it came into their hands, and thus Defendants acquired the stock with a view to distributing it. All four company Defendants issued board resolutions to break up their shares on the same date, directed Holladay to reissue their shares on the same date, transferred their shares to the same brokerage on the same date, and began selling their shares on the same date, all of which occurred within a very short time frame. According to Erickson, nothing occurred at Axis Technologies Group around November 13, 2006 that might explain why shareholders who were acting independently would begin selling their shares on that date. Defendants' lockstep coordinated activity in multiple steps within a short time frame reflects planned intentions to distribute the stock.[6]

Additionally, the Court concludes the SEC is entitled to an adverse inference against Defendants regarding whether they acquired the Axis Technologies Group shares with a view to distribute those shares. In civil proceedings, the Court may draw adverse inferences from a party's invocation of his Fifth Amendment right against self-incrimination. Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000). The question of whether to draw an adverse inference involves "tension between one

---

[6] For these same reasons, no genuine issue of fact remains that Defendants resold the stock "for an issuer" in connection with a distribution. Ackerberg, 892 F.2d at 1336 ("Whether the sale was 'for an issuer' can also be determined by whether the shares have come to rest.").

party's Fifth Amendment rights and the other party's right to a fair proceeding." Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 911-12 (9th Cir. 2008) (quotations omitted).  If the Court declines to draw the inference, the adverse party "is deprived of a source of information that might conceivably be determinative in a search for the truth."  Id. On the other hand, "under certain circumstances . . . an adverse inference from an assertion of one's privilege not to reveal information is too high a price to pay."  Id.

The Court resolves this tension "by analyzing each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation."  Id.  The Court does not draw the inference unless (1) the SEC has a substantial need for the information, (2) no other, less burdensome means of obtaining the information exists, (3) "the value of presenting [the] evidence" is not "substantially outweighed by the danger of unfair prejudice to the party asserting the privilege," and (4) independent evidence of the fact about which the party refuses to testify exists.  Id.  Whether to draw the adverse inferences lies within the Court's discretion.  Id. at 909.

Here, the SEC has a substantial need for the information regarding whether Defendants acquired the Axis Technologies Group stock with a view to distribute those shares.  Defendants have asserted the affirmative defense of the exemption under § 77d(a)(1).  Although the SEC may resort to circumstantial evidence in response, to the extent the above evidence does not suffice to meet the SEC's burden, the SEC has no other, less burdensome means of obtaining the information than by putting questions to Defendants regarding their intent.  The SEC questioned Defendants at their respective depositions about whether they bought the securities with a view toward distribution and about their coordinated activity in acquiring and selling Axis Technologies Group stock. (Pl.'s MSJ, Ex. 6 at 79-92, 105, Ex. 8 at 213-18, 224-25, 230, Ex. 9 at 124-25, 131-38, 142, 167-68, Ex. 10 at 62-64, 72-74, 76-81, 86.)  Each Defendant invoked the Fifth Amendment

in response to these questions.  (Id.)

The value of the evidence is not substantially outweighed by the danger of unfair prejudice to Defendants.  Had Defendants answered the questions at their depositions, their answers would have constituted admissible evidence bearing on the viability of Defendants' affirmative defense.  Finally, the SEC has presented independent evidence of Defendants' intent to distribute the securities, as discussed above.  Accordingly, the Court finds it appropriate to draw the adverse inferences against Defendants that they acquired Axis Technologies Group shares with a view toward distribution and engaged in coordinated activity in acquiring and selling Axis Technologies Group stock.  Viewing the above evidence in combination with the adverse inference, no genuine issue of fact remains that Defendants acquired the Axis Technologies Group stock with a view to distribute it.

b.  Public Offering

To determine whether there was a public offering, the Court evaluates "whether the offerees are in need of the protection which the Securities Act affords through registration."  Ackerberg, 892 F.2d at 1337; Platforms Wireless Int'l, 617 F.3d at 1090. Because the statute exempts transactions "as to which there is no practical need" for the registration requirement, "the applicability of [the private placement exemption] should turn on whether the particular class of persons affected needs the protection of the Act.  An offering to those who are shown to be able to fend for themselves is a transaction not involving any public offering."  Ralston Purina, 346 U.S. at 125.

Viewing the evidence in the light most favorable to Defendants, and viewing the substantive economic reality of the transactions, no genuine issue of material fact remains that there was a distribution, i.e., a public offering of Axis Technologies Group stock.  No registration statement ever had been filed for the company, none was filed at any point during the period Defendants sold the stock, and there is no evidence Axis Technologies Group made any other public filings which would have provided the general public with

information similar to that made available in a registration statement.  Consequently, none of the information that an issuer normally would have to disclose in a registration statement was disclosed to the general public.  Defendants have presented no evidence from which a reasonable jury could find that those to whom Defendants sold their Axis Technologies Group stock were sophisticated investors who did not need the statutory protections.  Rather, the evidence demonstrates Defendants received 15,000,000 Axis Technologies Group shares directly from the issuer and sold those shares without proper registration to the general public.  Defendants thereby operated "as conduits for securities being placed into the hands of the investing public."  Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 214-15 (3d Cir. 2006) (quotation omitted).

Because Defendants acquired the Axis Technologies Group securities with a view to distribution, and because Defendants sold the stock for an issuer in connection with a distribution, Defendants are underwriters and are not entitled to the exemption under § 77d(a)(1) for their sales of stock to the general public.  Additionally, the process as a whole constituted a distribution, i.e., a public offering, and Defendants therefore are not entitled to the exemption under § 77d(a)(2) for their acquisition of the stock from Axis Technologies Group.  Because Defendants' arguments regarding the alleged exemption for private offerings to accredited investors under Minnesota law depends on a nonpublic offering under § 77d(a)(2), the Court need not consider those arguments, as no genuine issue of fact remains that the process as a whole was a public offering, and thus § 77d(a)(2) does not apply.  The Court therefore will grant the SEC's Motion for Summary Judgment on its Section 5 registration claims in count one against all Defendants.  For these same reasons, the Court will deny Defendants Montgomery and MVC's Motion for Summary Judgment.

///

///

## C. The SEC's Fraud Claims Against Defendant Luna

The SEC brings fraud claims against Defendant Luna only.  In count two, the SEC alleges Luna violated Section 17(a)(1) of the Securities Act.  In count three, the SEC alleges Luna violated Sections 17(a)(2) and (3) of the Securities Act.  Finally, in count four, the SEC alleges Luna violated Section 10-(b) of the Exchange Act and Rule 10b-5.  For each count, the SEC contends Luna misrepresented material facts when he falsely stated in his October 24, 2006 opinion letter that the offers and sales of Axis Technologies Group stock to the Defendant companies were exempt from registration.  The SEC contends that when Luna sent Holladay the opinion letter, he knew Defendants were planning to engage in an illegal, unregistered public offering, but he intentionally misrepresented the nature of the transaction as a seed capital offering under Rule 504.  The SEC also argues the Court should draw an adverse inference against Luna due to his invocation of his Fifth Amendment rights when questioned on his knowledge and intent.

Luna responds that the SEC is not entitled to summary judgment on its fraud-based claims because the SEC has presented no evidence of Luna's state of mind.  Additionally, Luna contends he reasonably interpreted the law to allow for an exemption under § 77d(a)(2), Rule 504, and Minnesota law, and he therefore acted without scienter.  Luna further argues he had an objectively reasonable basis to conclude that the company Defendants were accredited investors based on subscription agreements for various stocks in which the company Defendants held themselves out as accredited investors.  Luna thus argues he lacked scienter because he had an objectively reasonable basis to represent that the company Defendants were accredited investors.  Luna contends that because the SEC has presented no independent evidence of scienter, an adverse inference against him based on his invocation of his rights under the Fifth Amendment is inappropriate.[7]

---

[7] In his Opposition, Luna asserts that the only issues related to the fraud claims are:
(1) Did Defendant Luna have a reasonable basis to believe he and the other

Section 17(a)(1) of the Securities Act, Section 10(b) of the Securities Exchange Act, and Rule 10b-5 prohibit making (1) a material misrepresentation or omission (2) in connection with the offer or sale of a security (3) with scienter (4) by means of interstate commerce.  <u>Phan</u>, 500 F.3d at 907-08;  <u>Platforms Wireless Int'l</u> 617 F.3d at 1092; <u>see also</u> 15 U.S.C. §§ 77q(a)(1), 78j(b); 17 C.F.R. § 240.10b-5.  Sections 17(a)(2) and (3) of the Securities Act similarly prohibit material misrepresentations or omissions of fact in the offer or sale of securities, but the SEC need not prove scienter to establish a violation of these sections.  <u>S.E.C. v. Dain Rauscher, Inc.</u>, 254 F.3d 852, 856 (9th Cir. 2001).  Rather, negligent misrepresentations or omissions will suffice.  <u>Id.</u>

Viewing the evidence in the light most favorable to Luna on the SEC's Motion for Summary Judgment, no genuine issue of fact remains that Luna violated each provision in counts two through four of the Complaint.  In his October 24, 2006 opinion letter to Holladay, Luna misrepresented the nature of the transactions as an exempt private

---

Defendants were accredited?
(2) Did Defendant Luna have a reasonable basis to believe that an issuance of securities under Regulation D, Rule 504, 17 C.F.R. § 230.504, and Minnesota statute § 80A.15 results in free-trading shares eligible for resale over the market?

(Luna Opp'n at 3.)  Luna contends the SEC "failed to plead any other facts, theories or claims" beyond these two issues with respect to the fraud counts.  (<u>Id.</u>)

The Complaint, however, alleges Defendant Luna "misrepresented the facts and nature of the transactions" to Holladay, falsely represented that the offers and sales to accredited investors were exempt, and falsely represented the four company Defendants were accredited investors when he knew they were not as part of an "orchestrated scheme."  (Compl. at 2-3, 7, 8-10; <u>see also id.</u> at 10 (alleging that Luna "falsely concluded to the transfer agent that the offers and sales to accredited investors were transactions exempted from registration with the Securities and Exchange Commission pursuant to Rule 504 and Minnesota law").)  The Complaint alleges Luna "created the Defendant Entities to act as conduits to allow him and his cohorts . . . to sell their stock into the public market at artificially supported prices."  (<u>Id.</u> at 3; <u>see also id.</u> at 8 (alleging the Defendant companies were "nominee corporations created by Defendant Luna to attempt to misuse the Minnesota registration exemption").  The Complaint sufficiently alleges that Luna engaged in a scheme to misrepresent the transactions as exempt to allow for the issuance of free trading shares, but Luna knew the true nature of the transactions, and thus knew the exemption was inapplicable because it was not a legitimate private placement offering under Rule 504.  Because it was not a legitimate private placement, it constituted a public offering of unregistered stock through the conduit company Defendants.

placement under Rule 504 and Minnesota laws and regulations when in fact, as discussed above, the process as a whole constituted a non-exempt public offering.  The misrepresentation was material because it induced Holladay to issue unrestricted, free trading shares which Defendants then could distribute to an uninformed investing public, who would want to know whether they were purchasing shares legitimately qualifying as free trading, and who would want to know that required disclosures for the stock were not provided.  See TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976) (stating a fact is material if a reasonable investor would view that fact as "having significantly altered the 'total mix' of information made available"); United States v. Naftalin, 441 U.S. 768, 773, 776 (1979) (concluding the fraud could occur at any point within the "the entire selling process, including the seller/agent transaction," and "the welfare of investors and financial intermediaries are inextricably linked--frauds perpetrated upon either business or investors can redound to the detriment of the other and to the economy as a whole").

Additionally, no genuine issue of material fact remains that Luna's misrepresentation was made in connection with the offer or sale of a security, because his opinion letter is what prompted Holladay to issue free trading shares which Luna then could sell to the uninformed investing public.  Consequently, the securities transactions and the misrepresentation coincide.  See S.E.C. v. Zandford, 535 U.S. 813, 825 (2002).  The interstate commerce element is satisfied because Luna mailed the letter to Holladay, the securities were sold through the New Jersey-based brokerage, and the sale proceeds were wired to St. Paul's bank account.

As to the applicable mental state, Section 17(a)(1) of the Securities Act, Section 10(b) of the Securities Exchange Act, and Rule 10b-5 require the SEC to establish Luna acted with scienter.  Scienter means "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quotation omitted).  "Scienter can be established by intent, knowledge, or in some

cases recklessness." Platforms Wireless Int'l, 617 F.3d at 1092 (quotation omitted). Conduct is reckless if it "consists of a highly unreasonable act, or omission, that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Dain Rauscher, Inc., 254 F.3d at 856. Sections 17(a)(2) and (3) of the Securities Act require only negligence. Id.

Viewing the evidence in the light most favorable to Luna on the SEC's Motion for Summary Judgment, no genuine issue of material fact remains that Luna acted with the requisite mental state for all of the SEC's claims. Given Luna's role in the transactions at issue, Luna knew that the nature of the process as a whole constituted a public offering which was not entitled to an exemption, as opposed to the private placement seed offering he represented to Holladay. At a minimum, there was a highly unreasonable risk that should have been obvious to Luna.

Luna was directly and substantially involved in every step of the transactions. Luna provided the proposed term sheet to Erickson, provided Erickson with the share exchange and acquisition agreement, wired the purchase money to Axis for all the company Defendants, provided Holladay with the opinion letter on behalf of Axis Technologies Group while also acting as a purchaser of that stock through St. Paul, provided Holladay with a board resolution from Axis Technologies Group directing the distribution of the 15,000,000 shares, and provided Holladay with the board resolutions for all Defendants to break up their shares and requested that all stock certificates be returned to him. (Pl.'s MSJ, Ex. 1 at 169, Ex. 7 at 36-37, 39-40, Ex. 11 at ¶ 13, 15, SEC_HLLDY_000015-26, SEC_HLLDY_000254-72, Ex. 39.) As discussed in more detail previously, Luna took these actions in the context of coordinated activity with the other Defendants, and Defendants REM and Matrix together transferred over $1.75 million of their proceeds from Axis Technologies Group stock sales to Luna.

Given Luna's substantial involvement in every aspect of the transactions at issue, Luna knew or recklessly disregarded that the entire process constituted an unregistered public offering not entitled to an exemption, yet he misrepresented the nature of the transaction to Holladay to obtain unrestricted, free trading shares to be sold to the general public.  At a bare minimum, Luna's representation to Holladay regarding the nature of the transactions was negligent.

Moreover, the Court concludes the SEC is entitled to an adverse inference against Luna regarding his scienter.  The SEC has a substantial need for the information because the SEC bears the burden of establishing Luna's state of mind to prevail on its fraud-based claims.  Although this burden may be satisfied through circumstantial evidence, to the extent the above evidence does not suffice to meet the SEC's burden, the SEC has no other, less burdensome means of obtaining the information than by putting questions to Luna regarding his intent.  The SEC did so in this action, but Luna invoked his Fifth Amendment rights.

Specifically, the SEC asked Luna what steps he took to satisfy himself that his opinion letter was correct; whether he believed the company Defendants qualified as accredited investors at the time he wrote the opinion letter; whether St. Paul and the other company Defendants were created to distribute securities to the market without the filing of a registration statement; whether St. Paul coordinated its stock sales with the other company Defendants; whether he worked with the other individual Defendants to sell shares to the market without registration statements; whether he intended to hold Axis Technologies Group stock long term; whether he intended from the time he acquired Axis Group Technology shares to sell the shares in the public market; and whether he was involved in creating advertisements for Axis Technologies Group stock.  (Pl.'s MSJ, Ex. 8 at 25-32, 41, 54, 57, 59-60, 82-84, 153, 160-64, 217, 224-25, 230-31.)  Luna invoked his Fifth Amendment rights in response to these questions.

The value of the evidence is not substantially outweighed by the danger of unfair prejudice to Luna.  Had Luna answered the questions at his deposition, his answers would have constituted admissible evidence bearing on an essential element of the SEC's case. Finally, the SEC has presented independent evidence of Luna's scienter in the form of circumstantial evidence of Luna's knowledge of the true nature of the transactions.

Accordingly, the Court, in its discretion, will draw the following adverse inferences against Luna:

• Luna took no steps to satisfy himself that his opinion letter was correct or the steps he took indicated his opinion was not correct;

• At the time Luna wrote the opinion letter, he did not believe the company Defendants qualified as accredited investors;

• St. Paul and the other company Defendants were created to distribute securities to the market without the filing of a registration statement;

• St. Paul coordinated its stock sales with the other company Defendants;

• Luna worked with the other individual Defendants on transactions to sell stock without registration statements;

• Luna did not intend to hold Axis Technologies Group stock long term;

• From the time Luna acquired Axis Group Technology shares, he intended to sell the shares in the public market; and

• Luna was involved in creating advertisements for Axis Technologies Group stock.

When these adverse inferences are combined with the other evidence discussed above, no genuine issue of material fact remains that the SEC has established Luna violated Sections 17(a)(1), (2), and (3) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5.  The Court therefore will grant the SEC's Motion for Summary Judgment against Defendant Luna as to counts two through four of the

Complaint.

**III.  CONCLUSION**

IT IS THEREFORE ORDERED that Defendants Nathan Montgomery and Minnesota Venture Capital, Inc.'s Motion for Summary Judgment (Doc. #74) is hereby DENIED.

IT IS FURTHER ORDERED that Plaintiff Securities and Exchange Commission's Motion for Summary Judgment (Doc. #75) is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiff Securities and Exchange Commission shall file an opening brief regarding any requested remedies on or before March 14, 2014. Defendants shall file response briefs on or before April 4, 2014.  Plaintiff Securities and Exchange Commission shall file a reply brief on or before April 18, 2014.

DATED: February 26, 2014

_____
PHILIP M. PRO
United States District Judge